# FILED

### UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

AUG 2 5 2004

UNITED STATES DISTRICT COURT
JUDGE WILLIAM T. HART

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | ) |
| | ) |
| PAUL L. GLOVER | ) |

No: 95 CR 40
Hon. William T. Hart

*DOCKETED*
*AUG 2 6 2004*

## UNITED STATES' RESPONSE TO DEFENDANT'S
## PETITION FOR A REDUCTION OF DISABILITY

COMES NOW the United States of America, by the undersigned, in response to Paul L. Glover's petition for a reduction of disability, and states:

Glover seeks a reduction in the length of the disability placed on him by 29 U.S.C. § 504. Glover's request for relief should be denied because Glover has not demonstrated that he is sufficiently rehabilitated or trustworthy to be entitled to relief from his employment disability.

## I.   STATEMENT OF FACTS REGARDING GLOVER'S OFFENSES

This Court is well aware of Paul L. Glover's underlying offenses which resulted in his statutory disqualification.   In short, Glover, the General Counsel and Vice-President of the Chicago Truck Drivers, Helpers and Warehouse Workers Union (Independent) ("CTDU"), and employee trustee of the CTDU Health and Welfare Plan and CTDU Pension Fund, conspired with John R. Johnson, Sr., the President of the CTDU to engage in at least six criminal schemes to defraud these organizations and enrich themselves.



Further, at his first trial, Glover took the stand and lied about his involvement in these schemes, and this court acknowledged these lies by increasing defendant's base offense level by two levels based on its finding that defendant had perjured himself at the first trial.[1]

## II.  GLOVER'S EMPLOYMENT DISABILITY PURSUANT TO 29 U.S.C. § 504

Title 29, United States Code, Section 504, as amended in 1984, prohibits individuals convicted of certain crimes from serving in specified capacities for a period which extends until thirteen years after such conviction or the end of any imprisonment resulting from such conviction, whichever is later.  29 U.S.C. § 504(a).  The sentencing order in this case provided that: "Pursuant to Title 29, United States Code, Section 504, the defendant may not in any capacity be involved in any labor organization for a period of thirteen years after end of imprisonment."  R. 134.  This employment disability remains in place unless 1) the state or federal sentencing court reduces the length of disability in regard to all prohibited capacities to a lesser period, which cannot be less than three years from the date of the judgment of conviction or the end of imprisonment, whichever is later, or 2) the convicted individual's citizenship rights are fully restored by pardon, or

---

[1]     A summary of each of these schemes and Glover's lies is set forth in the United States' Response to Glover's Petition for Exemption from Disability filed with this Court on September 10, 2001 at 7-21 (R. 138), which is incorporated herein by reference.

2

its equivalent in the jurisdiction of conviction, or 3) it is determined by the United States Parole Commission or a federal district court that such individual's employment in a particular prohibited position would not be contrary to the purposes of the labor act, respectively.

Pursuant to the policy of the United States Sentencing Commission, the following criteria are to be utilized by federal district courts in reviewing applications for relief from disability in a particular position prohibited by § 504 with respect to disqualifying crimes committed on or after November 1, 1987[2]:

---

[2]   Technically, relief is not granted pursuant to the sentencing policy statement at § 5J1.1 inasmuch as the policy statement governs only petitions for exemption from the disability in a particular prohibited capacity. See 29 U.S.C. § 504(a)(B) ("if the offense is a Federal offense, the sentencing judge . . . pursuant to sentencing guidelines and policy statements under section 994(a) of Title 28, determines that such person's service in any capacity . . . would not be contrary to the purposes of this chapter."). Reduction is a separate proceeding for relief.

However, by analogy to case law governing other statutory relief in § 504, Glover still has to demonstrate prior rehabilitation and trustworthiness to hold positions described in § 504. See Nass v. Local 348 Warehouse Employees, 503 F.Supp. 217, 221 (E.D.N.Y. 1980), aff'd without opinion, 657 F.2d 264 (2d Cir. 1981) (relief from disability under § 504(a)(A) by full restoration of revoked citizenship rights requires the demonstration of prior rehabilitation and trustworthiness to hold an otherwise prohibited position)("Although [section] 504 intrinsically provides for relief from the bar it creates, Congress has determined what shall constitute eligibility for lenient treatment, and Congress has set forth strict procedures for establishing rehabilitation and trustworthiness.").

> In such cases, relief shall not be given to aid rehabilitation, but may be granted only following a clear demonstration by the convicted person that he or she has been rehabilitated since the commission of the disqualifying crime and can therefore be trusted not to endanger the organization in the position for which he or she seeks relief from disability.

U.S.S.G. § 5J1.1. See In re The Petition of Louis R. Belpedio, 53 F.Supp. 239 (N.D. Ill. 1990)(exemptive relief under U.S.S.G. § 5J1.1 and 29 U.S.C. § 504 denied to convicted former union officer who failed to clearly demonstrate how he had been rehabilitated since the commission of the disqualifying crime where remorse or contrition for the disqualifying crime was not shown by the convicted individual); and Beardsley v. United States, 807 F.Supp. 1192 (W.D. Pa. 1992) (exemptive relief under U.S.S.G. § 5J1.1 and 29 U.S.C. § 504 denied to a convicted individual who had failed to clearly demonstrate sufficient rehabilitation and trustworthiness to be a candidate for a union business agent's position despite evidence of his positive efforts during the fifteen-month period since the offense to deal with history of alcoholism related to offense).

With respect to violations before November 1, 1987, in making its determinations, the Parole Commission consistently considered three factors: (1) the character and gravity of the disqualifying offense, (2) the nature of the position for which the exemption is requested, and (3) the extent to which the record indicates that an applicant is sufficiently rehabilitated and can be expected to

4

adhere to the highest standards of responsibility and ethical conduct in carrying out the duties of the union office. See, e.g., Application of Lonzo Donald Gray, United States Parole Commission, No. L-55, slip op. at 9 (1980) (attached as Exhibit B to the United States' Response to Glover's Petition for Exemption from Disability filed with this Court on September 10, 2001 (R. 138)).

The applicant has the burden to show by a preponderance of the evidence that he has been rehabilitated and is trustworthy. Id. The applicant must prove that despite his disqualifying conviction, he has conducted himself in such a manner as to indicate he is in fact a person of high standards of responsibility and ethical conduct who can be entrusted with union power in a position of responsibility, trust, and leadership; that there is no reason to feel that he will abuse his powers through corruption, breach of fiduciary duty, violence or other misconduct; and that by his conduct and activities he has led an exemplary life. Id. at 9-18. The Parole Commission does not view § 504 as punitive in nature, but rather as "a remedial statute intended to protect the public interest in having honest, trustworthy and responsible officials in labor unions." Id. at 11; see also, Carollo v. Herman, 84 F.Supp.2d 374, 376-78 (E.D.N.Y. 2000)(discussing the instructive nature of Parole Commission regulations to judicial proceeding for relief under § 504).

5

Because a reduction of the disability to the requested period of "three years, effective June 6, 2004" [Glover's Petition at 8] would effectively exempt Glover in all positions described in § 504, it is appropriate that Glover demonstrate that he has been rehabilitated to the degree that he could be trusted to hold any of the capacities described in § 504. In other words, he must demonstrate rehabilitation and trustworthiness beyond the rehabilitation and trustworthiness required for the single position which he mentions in his petition, namely, "labor consultant." Glover's Petition at 3.

Like a petition for exemption, a reduction of the length of disability is addressed to the court's discretion. See United States v. Hughes, 964 F.2d 536, 537 (6th Cir. 1992) ("The district court's imposition of the three-year term represented a discretionary reduction downward from section 504's automatic imposition of a thirteen-year disability. The court reduced the disability to three years because it believed Hughes' conduct resulted from a misguided but benign interest in helping his union.").

But, a court's exercise of its discretion can be based on or revisited for bad behavior during the waiting period in which the convicted individual was disqualified from prohibited service. Id. at 538-39 ("The district court then considered whether it was still appropriate to reduce Hughes' automatic civil employment disability

6

from thirteen years to three years, given this court's order reinstating the felony convictions under counts thirty-six and thirty-seven. The district court found that reduction of the automatic disability was now inappropriate in light of Hughes' conduct since his first sentencing. Specifically, the court found that 'his actions demonstrate[d] a general contempt for the existing authority of the union.' The court noted that § 504 was designed to purge the labor movement of its criminal element and to prevent convicted union leaders from regaining control of union government. The court emphasized that it was not sentencing Hughes to the thirteen-year disability because of his actions since the original sentencing. The court stated that, in order to give full effect to the statute's provisions, it was merely refusing to exercise its discretion to reduce a statutorily required thirteen-year period.") (discussion of district court's vacating of reduction relief in face of new evidence that the defendant had continued to function in his union position contrary to § 504 statutory mandate).

Accordingly, this Court should deny Glover's petition for relief if he fails to demonstrate that his conduct since his offense, and especially his conduct since the denial of his prior petition for exemptive relief in November 2001, falls short of rehabilitation and trustworthiness to serve in the capacities described in § 504.

## II.  **GLOVER HAS NOT ESTABLISHED THAT HE HAS BEEN REHABILITATED OR IS TRUSTWORTHY**

Despite his claims to the contrary, Glover has not met his burden of clearly demonstrating that he has been rehabilitated since the commission of his crimes and is trustworthy.  Attached as Exhibit A is a Report of Investigation submitted by Department of Labor Senior Investigator Jane Yelvington.  This report, although based upon an investigation conducted in a relatively limited period of time, raises serious questions regarding Glover's conduct since his commission of the underlying offenses and sharply calls into question Glover's claims regarding his rehabilitation.

In particular, Glover's claims may be challenged in five key areas: First, his conduct subsequent to his commission of the underlying offenses, but prior to his incarceration; second, his use of Glover & Associates to hide his personal income and avoid forfeiture and cost of prosecution payments; third, his violation of his conditions of supervised release by his association with felons; fourth, his already potential violations of his § 504 ban; and fifth, his continued failure to apologize to the CTDU or its funds or to make sufficient restitution.[3]

---

[3]     In addressing each of these areas, the United States relies primarily upon the results of Senior Investigator Yelvington's report (Exhibit A) and, more specifically, the exhibits thereto (numbered 1 through 35) summarizing her interviews with witnesses and setting forth documents she was provided.

**A. Glover's Conduct Subsequent to Commission of the Underlying Offenses, but Prior to His Incarceration, Demonstrates a Lack of Rehabilitation and Trustworthiness.**

Glover continues to make the false claim that from September 1992 (the final date of Glover's underlying offenses) until June 1995 (the date of Glover's second trial), "Petitioner committed no crimes of any kind while he was a labor consultant, nor was he ever charged with the commission of any crime by any individual, court or agency, including the Department of Labor, for any act while he was a labor consultant." Glover's Petition at 4. This same argument already has been rejected by this Court in its November 8, 2001 Order rejecting Glover's initial petition for exemption from disability. See Memorandum Opinion and Order of November 8, 2001 (R. 148), Exhibit A (Exhibit 6):

> Defendant places great weight on his contention that he has committed no crimes since the 1992 offenses charged in the indictment and that he worked as a labor relations consultant for three years without any misconduct. He contends that this shows he was rehabilitated, or at least close to it, by the time he first began serving his present sentence and that he would not represent a danger if again permitted to work in such a position. However, during his first trial in May 1995, defendant took the stand and lied about his offense conduct. . . . Additionally, during the initial sentencing of 1995, defendant did not acknowledge that he had committed the charged offenses and expressed no remorse about his criminal conduct. Defendant cannot successfully contend that his conduct as of 1995 shows that he was on the road to rehabilitation.
>
> Moreover, in response to defendant's initiation of the present process, the Secretary of Labor conducted an investigation and interviewed a number of people. This included an interview of the owner of a labor consulting firm ("[Irving J.] Brown") for which defendant provided services

9

from October 1992 to November 1993 and an interview of an attorney for the CTDU funds defendant formerly managed. Glover's consulting firm was an independent contractor for Brown and worked on four projects before Brown stopped using Glover's services because of unsatisfactory performance. Brown related that Glover used unethical and prohibited tactics; retained an incompetent associate because, according to Glover, the associate knew too much about Glover's conduct at CTDU; failed to file all required reports; used confidential information of Brown to raid Brown's clients for Glover's own firm; and double billed. The funds' attorney related that, after leaving CTDU, Glover made false accusations about the funds in attempt to solicit the business of companies that had contracts or dealings with CTDU; tried to represent firms before the NLRB in defense of charges that had been filed by Glover as CTDU counsel until he was disqualified for the conflicts of interest; was mistakenly overpaid at the time of his termination and had to be sued and collection proceedings initiated before he returned the over payment; and brought a number of suits against CTDU and the funds, including at last one after he was sentenced, all of which were lost by Glover, but which caused CTDU and the funds to incur substantial attorney fees. . . .

In light of Glover's obstruction of justice in 1995, his failure to accept responsibility at his 1995 sentencing, and the statements of Brown and the attorney, Glover has not shown that the labor consulting he performed from 1992 through 1995 is evidence that he can presently perform such work without risk of committing further crimes or improprieties.

Exhibit A (Exhibit 6) at 6-8.

Glover's new petition presents no new evidence to suggest that the Court's previous findings should be overturned and instead of supporting his present petition, Glover's conduct subsequent to commission of the underlying offenses, but prior to his incarceration, demonstrates a lack of rehabilitation and trustworthiness.

10

**B.     Glover's Use of Glover & Associates to Hide His Personal
        Income and Avoid Forfeiture and Cost of Prosecution Payments
        Demonstrates a Lack of Rehabilitation and Trustworthiness.**

At the time of his sentencing, Glover was ordered to forfeit
to the United States $350,000 and to pay a cost of prosecutions of
$16,811.84.  See Exhibit A (Exhibit 1).  To date, despite Glover's
significant income from his commission of the offense, none of the
$350,000 has been paid to the United States, and only a portion of
the $16,811.84.  Instead, Glover has attempted to conceal his
income from the United States and the Office of Probation by his
use of the business name of Glover & Associates.

Glover has been consistent in his attempt to shield his income
from discovery and attachment by any entity.  After being forced
from office at the CTDU, Glover and Matthew Perovic formed Glover
& Associates.  Glover has described Glover & Associates as "a
management-consulting firm assisting management in effectuating
meaningful change in the workplace."  See Exhibit A (Exhibit 34).
Although Glover's wife's (Deborah Glover) participation in the firm
was limited to typing, she was listed, at Glover's request, as
half-owner with Perovic.  See Exhibit A (Exhibit 8b).  After Glover
was indicted, Glover & Associates became Quantum Consulting, and
Deborah Glover continued on as half-owner, despite the fact she
only did the firm's typing.  After Glover went to prison, Perovic
continued to operate Quantum on a very limited basis.  See Exhibit
A (Exhibit 8a).

11

After Glover got out of prison, Glover & Associates was reincorporated with Deborah Glover listed as President. See Exhibit A (Exhibit 18a). In conversations with his Probation Officer, Bridget Gannon, Glover consistently attempted to minimize his involvement in Glover & Associates. Glover represented that Glover & Associates was solely owned by his wife and that he was a mere independent contractor for Glover & Associates who was paid $1200 a month. Glover acknowledged that the only function Deborah Glover performed for Glover & Associates was typing. Because Glover & Associates was not owned by Glover, Gannon never was given copies of Glover & Associates financial statements and had no idea of its total income. See Exhibit A (Exhibits 11 and 25).

While Glover was telling his Probation Officer this story in what was, the United States submits, an attempt to limit his exposure to additional forfeiture and cost of prosecution payments, Glover was more honest with the rest of the world. On his website, www.realityethics.com, Glover acknowledged that he was the one who had "formed" the initial firm of Glover & Associates. See Exhibit A (Exhibit 14). On his resume, Glover claims that he was "the principal operating partner" in the initial firm of Glover & Associates. See Exhibit A (Exhibit 22b). Glover's business card for the latest reincarnation of Glover & Associates lists himself as "PRINCIPAL." See Exhibit A (Exhibit 18b). A July 2003 Glover & Associates press release announcing that Glover had been

12

certified as a professional speaker by the National Speakers Association refers to Glover as "PRINCIPAL PAUL GLOVER." <u>See</u> Exhibit A (Exhibit 18). In a resume to teach at the University of Phoenix, Glover referred to himself as the founder and "Principal Operating Partner" of Glover & Associates. <u>See</u> Exhibit A (Exhibit 34). Glover conceded to Senior Investigator Yelvington that he has the title "Principal," but disingenuously emphasized that that was "just a title which appears on his business card." <u>See</u> Exhibit A (Exhibit 18a).

In reality, it was Glover himself who owned and operated Glover & Associates, not his wife. Deborah Glover was employed full-time during all relevant periods as the manager of a women's clothing shop in Hinsdale. <u>See</u> Exhibit A (Exhibit 24a).

The beauty, of course, of setting up Glover & Associates with Deborah Glover as the straw owner was that all income earned by Glover, and otherwise subject to attachment or forfeiture or cost of prosecution payments, could be laundered through Glover & Associates so that Glover's Probation Officer and the United States would have no idea of Glover's real income. Therefore, when Glover did consulting work, he consistently asked that payment be made, not to him personally, but to Glover & Associates. <u>See</u> Exhibit A (Exhibits 15a, b, and c, 21a, 22a, and 23). For example, between about 2001 and 2002, Glover did between $35,000 and $40,000 worth of work for Elliott Goldstein and, per Glover's request, Goldstein

made payment for Glover's services to Glover & Associates. Steven Bierig also paid Glover & Associates for Glover's services, and said that he understood Glover & Associates to be a firm Glover set up through his wife, and that it was how they set up the financial arrangements. See Exhibit A (Exhibit 15a and b). When Glover was to teach a course at Moraine Valley Community College in 2003, he requested that payment be made to Glover & Associates. See Exhibit A (Exhibit 22a). Glover's explanation for payment to Glover & Associates instead of to himself, that "[t]hat method of payment for services rendered usually cuts down on the amount of paperwork that needs to be filled out," rings hollow. See Exhibit A (Exhibit 22). Further, work Glover has done for Perovic at Quantum Consulting has been paid with payments to Glover & Associates at Glover's request. See Exhibit A (Exhibit 8b).

If these payments had been made to Glover personally, or if they had been made to a company he owned on paper, they would have been subject to discovery by Glover's Probation Officer and Glover potentially would have been subject to greater cost of prosecution payments. Glover's Probation Officer required him to pay 10 percent of his income towards the cost of prosecution (see Exhibit A (Exhibit 11)), and if all of the income Glover actually received had been disclosed, Glover would had to have paid considerably more. Glover chose not to disclose to his Probation Officer the amount of work he performed for Glover & Associates and the amount

14

of billings he generated. See Exhibit A (Exhibit 11). Glover's cheap and tawdry scheme to use his wife as a straw to avoid his own legal responsibilities imposed by this Court is reminiscent of the schemes for which Glover was initially convicted and the manner in which Glover kept himself in the background in the conduct of those schemes to avoid detection.

Therefore, Glover's use of Glover & Associates to hide his personal income and avoid forfeiture and cost of prosecution payments[4] demonstrates that the zebra has not changed his stripes, and demonstrates Glover's lack of rehabilitation and trustworthiness.

**C.  Glover's Violation of his Conditions of Supervised Release by His Association with Felons Demonstrates a Lack of Rehabilitation and Trustworthiness.**

When Glover was placed on supervised release, he knew that one of the conditions of his supervised release was that he could not associate with felons. Instead of complying with this explicit condition of his supervised release, Glover blatantly violated it by setting up a business whose business consisted, in part, of Glover's counseling felons.

Glover's Probation Officer informed Glover that he was forbidden to have contact with convicted felons. See Exhibit A (Exhibit 11). Glover confided in Perovic that when he first

---

[4]  This dodge would also permit Glover to avoid payment of any back taxes and penalties he may owe the IRS.

15

considered starting the business of consulting white collar criminals who were facing prison, his Probation Officer had vetoed the idea because it would be a violation of his conditions of supervised release. See Exhibit A (Exhibit 8a).

Despite this admonition, Glover proceeded, knowingly and willfully, to do what he knew to be wrong.[5] In 2003, in his www.realityethics.com website, Glover held himself out as someone prepared to engage in counseling with convicted felons regarding their upcoming prison experience. See Exhibit A (Exhibit 14). Glover promised to be able to "maintain[] contact with [the convicted felon] and his family during the period of incarceration, including halfway house and home confinement, to assist them with the ongoing issues that accompany extended incarceration" and help the convicted felon "and his family adjust to Supervised Release and the realities of life after prison." See Exhibit A (Exhibit 14). In a June 2003 letter to Chicago defense attorney Tom Breen, Glover "announced the formation of Glover & Associates' Post-Conviction Consulting Services" in which he offered his services in helping convicted felons prepare for and experience their incarceration. See Exhibit A (Exhibit 27). Senior Investigator Yelvington's report details at least one attorney who employed

---

[5]     One doubts whether Glover's Probation Officer so charitably would have recommended that his supervised release be terminated if she had known what Glover failed to disclose to her, but is set forth herein.

Glover to assist his convicted client. See Exhibit A (Exhibit 28).
Because Glover has refused to provide the United States with a
complete list of his clients, we do not know how many felons with
whom Glover associated in direct violation of his Probation
Officer's explicit order. See Exhibit A (Exhibit 19b).

Glover's knowing, willful, and blatant violation of a
condition of his probation is a sobering reminder of just how
little Glover has changed since the time of his commission of his
underlying offenses and teaches that Glover still has not been
rehabilitated and is not trustworthy.

**D. Glover's Already Potential Violation of His § 504 Ban
Demonstrates a Lack of Rehabilitation and Trustworthiness.**

Glover already has engaged in conduct that may be a violation
of his § 504 ban. Senior Investigator Yelvington's investigation
indicates that Glover has not complied with the terms of his
disability since the end of imprisonment and denial of relief in
2001. Such non-compliance is a hallmark of the absence of
rehabilitation and trustworthiness. See Hughes, supra. Glover has
already offered to teach a course involving labor activities,
activities which may be seen as having been in violation of the
conditions of his § 504 ban, and engaged and other questionable
conduct with Matthew Perovic.

First, Senior Investigator Yelvington's report indicates that
it was Glover's intention in September 2003 to effectively function
as a "labor relations consultant or adviser" which, if fully acted

17

on in the appropriate jurisdictional setting, would have violated § 504(a)(2).[6]  In a public information release reportedly approved by Glover (Exhibit A (Exhibit 21a)), Glover informed the public that he would be advising the attendees of a two-day seminar at a community college about "Union-management Negotiations" for which the college would charge a fee of $160 per participant and compensate him through the firm by which Glover was ostensibly employed, Glover and Associates dba Quantum Consulting.  See Exhibit A (Exhibit 21).  By email dated September 8, 2004, the college's training coordinator, Nancy Glickman, advised Glover that employees of the college's human resources department and members of the negotiating team may be interested in attending the seminar. See Exhibit A (Exhibit 22a).  When the human resources department and negotiating team could not attend, the seminar was cancelled for lack of response by the public.  See Exhibit A (Exhibit 22a).

The phrase "labor relations consultant" is defined as "any person who, for compensation, advises or represents an employer, employer organization, or labor organization concerning employee organizing, concerted activities, or collective bargaining activities."  29 U.S.C. § 402(m).  It is evident from the circumstances surrounding the seminar, that Glover intended to

---

[6]     It would appear that if the college's negotiating team had participated in the class, that alone would not have provided the basis for a § 504 violation because the college is a state entity and its employees are not covered under the labor acts.

render advice on collective bargaining to an audience which he knew would include a negotiating team for an employer and for which he was going to be compensated. That is, compensation of the disqualified individual need not be made directly, but can be made indirectly. In the companion statute to § 504, 29 U.S.C. § 1111, a similar definition of compensated "consultant" was judicially construed to include an individual who worked for a third party service provider to a plan and who was not directly compensated by the plan. United States v. Smith, 698 F.Supp. 589 (E.D. Pa. 1988), aff'd without opinion, 872 F.2d 415 (3d Cir. 1989) (convicted individual employed by insurance carrier to provide advice to benefit plan clients could be prosecuted for intentional service as a "consultant . . . to a benefit plan" even if he was not employed directly by the plan, but worked for an organization which provided services to the plan). Furthermore, the term "adviser" in § 504 has been judicially interpreted to cover uncompensated advice. See 29 U.S.C. § 504(a)(1)&(3) and United States v. IBT, 838 F.Supp. 800 (S.D.N.Y. 1993), aff'd without opinion, 33 F.3d 50 (2d Cir. 1994) (the term "consultant or adviser to a labor organization" in § 504 includes uncompensated service in contrast to a compensated "labor relations consultant" defined at 29 U.S.C. § 402(m)). In IBT, a disqualified union official had no contract with the union whose officers he volunteered to advise contrary to § 504 and for which he was sanctioned. Id. at 813-14.

However, a full-blown violation of § 504 did not occur because of the fortuitous event that the seminar was cancelled for reasons beyond Glover's control.[7] That is, § 504 does not forbid or punish "attempted" service or giving of advice in a prohibited capacity. See 29 U.S.C. § 504(a) ("No person who . . . has been convicted [of a disqualifying crime] . . . shall serve or be permitted to serve. . . .").

Second, Glover advised the college in the course description that he was the "principal operating partner" in Glover & Associates, "a management-consulting firm, specializing in labor and employment law issues including negotiations facing small to medium sized companies." See Exhibit A (Exhibit 22).

Third, Glover also provided the college with a list of seminars which he had presented in the past which included "Do the Right Thing!: Union Ethics and the 21st Century Union Officer." Among the topics included in this seminar for union officials are the duty of fair representation, organizational activities, fiduciary responsibilities, and ethical issues in campaigning for union office. See Exhibit A (Exhibits 14 and 22c).

In his resume, Glover advised that during 2003 he had also delivered to "23 employee and employer organizations" a seminar

---

[7]     Again, as set forth above, it would appear that if the college's negotiating team had participated in the class, that alone would not have provided the basis for a § 504 violation because the college is a state entity and its employees are not covered under the labor acts.

entitled "Surviving the Workquake of the New Economy Job Environment." <u>See</u> Exhibit A (Exhibit 22b). The outline of this seminar describes economic conditions and job skills and does not purport to deal with labor-management relations on its face. <u>See</u> Exhibit A (Exhibit 22c).

If Glover in fact was engaged by such organizations to advise employer, union, and benefit plan personnel about such topics, he violated the spirit, if not the letter, of 29 U.S.C. §§ 504 and 1111. The terms of §§ 504 and 1111 have been construed liberally by the courts in order to effect the statutes' remedial purposes. <u>See</u>, <u>e.g.</u>, <u>Smith</u>, <u>supra</u>; <u>IBT</u>, <u>supra</u>.

Finally, it appears that Glover gave advice to Perovic in Perovic's labor arbitration practice. According to Perovic, in early 2004, Perovic was employed to be the arbitrator of record for a collective bargaining agreement between PTI, Inc. of Evansville, Indiana and Local 1222 of the United Service Employees Union of Albany, New York. Again, according to Perovic, he had an arbitration scheduled in Collinville, Illinois, and Glover asked to go along. Perovic claims that Glover provided no services for Quantum in Collinville and did not write the arbitrator's decision; Glover merely wanted an excuse to get out of the house and received no compensation for the trip. Perovic and Quantum did, however, pay Glover's expenses for this trip. <u>See</u> Exhibit A (Exhibit 8b).

21

But Perovic's account may be questioned. First, this Court will recall that Perovic is a long-time friend and associate of Glover, and testified on Glover's behalf at his trial. Second, Perovic is the "incompetent associate" that Irving J. Brown claimed Glover retained because he knew too much about Glover's conduct at CTDU. See, supra at 9. Third, so that Glover could make this road trip, Deborah Glover wrote a letter to Glover's Probation Officer requesting that Glover "be permitted to engage in business travel" to Collinville, Illinois on January 6 and 7, 2004 "to perform services for Quantum Consulting, a client of Glover & Associates." Deborah Glover represented to the Probation Officer that "[a]ll expenses for this trip will be paid by the client.[8]" See Exhibit A (Exhibit 29). Fourth, there is the smoking gun. Contained in materials Perovic provided pursuant to service of a subpoena were two emails from Glover to Perovic containing what appear to be Glover's drafts of the decision and award. In the January 9, 2004 email, Glover stated: "Attached is everything but the decision part of the award. Thought you might like to get started on it." A

---

[8]     There are three possible interpretations of this representation. First, it is possible that Glover lied to his wife about the nature of his trip with Perovic, and Deborah Glover was Glover's unknowing pawn. Second, Deborah Glover knew the trip was personal, but knowingly lied on her husband's request. Third, Deborah Glover wrote the truth. None of these three possible interpretations are consistent with Glover's self-proclaimed rehabilitation and trustworthiness. Rather, they simply confirm everything we long ago learned about Glover's mendacity during his two trials.

draft Opinion and Award was then attached.  In the January 10, 2004 email, Glover stated: "Check out the finalized Discussion and Award sections and let me know what you think."[9]  See Exhibit A (Exhibit 31).

Based on the above[10], it appears that Glover has not complied with the terms of his disability since the end of imprisonment and denial of relief in 2001.  Such non-compliance is strong evidence of the absence of rehabilitation and trustworthiness.

**E.  Glover's Continued Failure to Apologize the CTDU or Its Funds or to Make Restitution Demonstrates a Lack of Rehabilitation and Trustworthiness.**

Finally, Glover's lack of rehabilitation and trustworthiness is demonstrated by his continued failure to apologize to the victims of his underlying criminal activity, the CTDU or its funds, or to make any restitution.  As of July of this year, neither the CTDU, its funds, or members have received any expression of remorse or apology from Glover.  The only restitution received by the CTDU or its funds came as a result of suits filed against M.D. Sass, a former money manager for the funds, and against Ronald Marolda, a

---

[9]     Further, based on its observation of both Perovic's and Glover's trial appearance and testimony, this Court is in a good position to opine on who actually wrote these drafts.

[10]     Without a complete investigation, the full extent of Glover's activities and potential violations cannot be known.  It is of note that Glover has refused to provide the United States with a complete list of Glover & Associates clients or an accounting of all his employment since January 2001.  See Exhibit A (Exhibit 19).  One can only wonder what else Glover has to hide.

broker who paid kickbacks to Glover; through partial payment of a bonding claim; and some monies paid by Glover's fiduciary insurance as a fund trustee. <u>See</u> Exhibit A (Exhibits 16 and 17). Glover has not paid a penny on his own.

## III. <u>CONCLUSION</u>

For the reasons set forth above, Glover's petition for a reduction of disability should be denied because he has not demonstrated that he is rehabilitated and trustworthy to service in any prohibited capacity described in § 504, and entitled to a reduction of the § 504 disability imposed on him based upon his conviction in this Court. Indeed, based upon the information set forth herein, this Court should consider 1) issuing an order to show cause why Glover should not be held in violation of his supervised release, 2) declining to terminate Glover's supervised release, and 3) directing Glover's Probation Officer to impose upon him new reporting requirements including, but not limited to, his

24

disclosing to her the full extent of his employment, consultation, and compensation.

Respectfully submitted,

PATRICK J. FITZGERALD
United States Attorney

By:

DAVID D. BUVINGER

STEPHEN D. ANDERSSON
Assistant United States Attorney
219 S. Dearborn St., 5th Floor
Chicago, Illinois 60604

25

# *See Case*

# *File For*

# *Exhibits*